[L. A. No. 2324.  Department Two.—April 7, 1911.]

W. T. S. HAMMOND, as Administrator of the Estate of Mer-
rill A. Weir, Deceased, Respondent, v. A. M. F. McCOL-
LOUGH, Administrator of the Estate of Nancy A. Weir,
Deceased, Appellant.  (No. 52998.)

W. T. S. HAMMOND, as Administrator of the Estate of Mer-
rill A. Weir, Deceased, Respondent, v. A. M. F. McCOL-
LOUGH, Administrator of the Estate of Nancy A. Weir,
Deceased, Appellant.  (No. 52999.)

HUSBAND AND WIFE—TRANSFERS TO AVOID PROBATE—FRAUD.—Attempts
by a husband and wife to avoid the delay and expense of probate
by the execution of papers, the one to the other, which were either
to be destroyed or placed of record, according as the one or the other
should happen to die first, are not favored.  Such attempts are in
the nature of a fraud upon the law, and must stand or fall, not in
accordance with the intention of the parties, nor in contemplation
of the innocence of their purpose, but solely in consideration of
what by their acts they legally accomplished.

ID.—DELIVERY QUESTION OF FACT.—Whether the delivery of an instru-
ment has actually been made or not is a question of fact.

ID.—COMMUNITY PROPERTY—LAND DEEDED TO WIFE—EVIDENCE SHOW-
ING COMMUNITY CHARACTER.—Where land is conveyed to a married
woman by an instrument in writing, the presumption is, under sec-
tion 164 of the Civil Code, that the title vested in her as her sep-
arate property.  Evidence, however, that the property was purchased
and paid for out of community funds, that it was purchased for and
used as the family home, without surrender of exclusive possession
to the wife, that all business was transacted by the husband and
none by the wife; that in the case of other lands, title to which
stood in the name of the wife, the husband made the contracts for
their sale and that the wife made a deed pursuant thereto; and
that where promissory notes were taken in the name of the wife,
the moneys for which the notes were given were paid over by the
husband out of the community funds, and when payments were
made on the notes they were made to the husband and receipted
for by him, is sufficient to sustain a finding that the land was
community property.

ID.—DEED FROM WIFE TO HUSBAND—DELIVERY—DESTRUCTION OF DEED
AFTER HUSBAND'S DEATH.—Subsequent to the execution of such
deed to the wife, she, in pursuance of the directions of her hus-
band, took a deed to the property drawn by him, from herself as
grantor, to him, as grantee, and acknowledged it before a notary,

by whom she was instructed that in order to vest title in her husband it would be necessary for her to deliver the deed to him, but that it was not necessary to have it recorded. The notary further instructed her that if so delivered and not recorded, and her husband died first, she could destroy the deed and the record title would stand in her name. She gave the deed to her husband, who informed her that she had correctly obeyed his instructions. He retained possession of the deed, did not place it of record, and upon his death it was destroyed by his wife. *Held,* that the evidence was sufficient to show a delivery of the deed by the wife, with intent to divest herself of her dominion and control over the property beyond power of recall, and to immediately vest her husband with title to it.

ID.—FRAUD AS DEFENSE MUST BE PLEADED.—When fraud is relied on as an element of defense and invoked as conferring a right against the plaintiff, it must be alleged.

ID.—DECLARATIONS OF HUSBAND—QUIETING TITLE TO LAND STANDING IN NAME OF WIFE.—In an action by the personal representative of a deceased husband, against his wife's estate, to quiet title to land which stood in the name of the wife, on the ground that it was community property, declarations of the husband, to the effect that it was unnecessary that he should make a will, that his wife had everything, and that he had given or had left everything to her, are but expressions of his belief as to what he had done or accomplished, and are not controlling in determining what in fact he had or had not done or accomplished.

ID.—PERSONAL PROPERTY ACQUIRED DURING COVERTURE.—Personal property acquired by the spouses during coverture, and not by gift, devise, or descent, although standing in the name of the wife, will be deemed to be community property, when it appears that the husband attended to all business and maintained to his death the absolute dominion and control of the property in all its phases; that his wife was utterly ignorant of and unversed in business, and that the same was acquired with community property.

ID.—BILL OF SALE TO WIFE—WANT OF DELIVERY.—It is held, upon a review of the evidence, that a purported bill of sale of such personal property from the husband to his wife, was never delivered to her.

APPEALS from judgments of the Superior Court of Los Angeles County and from orders refusing a new trial. W. P. James, Judge.

The facts are stated in the opinion of the court.

Valentine & Newby, for Appellant.

Hunsaker & Britt, for Respondent.

HENSHAW, J.—In case numbered 52998, W. T. S. Hammond, administrator of the estate of Merrill A. Weir, deceased, brought action against A. M. F. McCollough, administrator of the estate of Nancy A. Weir, deceased (wife of Merrill A. Weir), to quiet title to real property situated in the city of Los Angeles, claimed by plaintiff administrator to be a part of the estate of his intestate and by the defendant administrator to be a part of the estate of his intestate. In case numbered 52999, the action was between the same parties to recover possession of certain personal property under the same contention of plaintiff and against the same answer thereto by defendant. The cases were tried together; judgment in both passed for plaintiff and defendant appeals.

They will be considered in one opinion.

Case No. 52998. Certain evidentiary facts and considerations are applicable to both cases and may thus be summarized. Merrill A. and Nancy A. Weir married in Indiana when he was twenty-two years of age and she was eighteen. They "started on nothing." The husband engaged actively in business and was successful. They came to San Diego, California, in 1892, and there resided for four or five years when they moved to Los Angeles. They there lived together until Mr. Weir died intestate on November 14, 1905. His wife survived him but a few months and died also intestate on the seventh day of March, 1906. Thus their marriage relationship had existed for over fifty years. During this long period they had acquired property, real and personal, of much value. It does not appear that either succeeded to any property by gift, devise, or descent, and, presumptively, therefore, all their property was community property. They died childless. Mr. Weir transacted all business, and except in the particulars hereinafter to be considered, retained title, dominion, ownership, and control over all the property. Mrs. Weir was quite ignorant of business and transacted none except as hereinafter noted. The whole controversy between the representatives of the estates of the husband and of the wife arises over the fact that during their lifetime they formulated a plan and attempted to put it in operation whereby upon the death of either the other should succeed to all of the property without probate. Their effort was the not uncommon one of attempting to avoid the delay and expense of probate by the

execution of papers, the one to the other, which were either to be destroyed or placed of record, according as the one of the other should happen to die first. Such attempts are sometimes successful by the suppression of one form of evidence and the destruction of another. The law never favors them; nor can it do so since they are in the nature of a fraud upon it which may and sometimes does lead to great wrong. When such transactions are brought to light and subjected to the dissecting knife and probe of the law the transactions themselves must stand or fall, not in accordance with the intention of the parties, not in contemplation of the innocence of their purpose, but solely in consideration of what by their acts they legally accomplished.

The land which is in controversy in the case under consideration was purchased from Rachel Elliott who made her deed on September 14, 1901, to Nancy A. Weir, the wife. This deed was placed of record, and at the time of the husband's death, and later, at the time of the wife's death, the record title remained in the latter. On this land in the following year a dwelling-house was erected and this dwelling-house was the home of the Weirs until their death. The court found relative to this property that it was community property, that the title to it was taken in the name of the wife with the intent on the part of herself and husband that it should be and remain community property, and that previous to the death of the husband—namely, on the twenty-first day of June, 1905—the wife executed and delivered her deed of grant to the husband of the premises, conveying to him the land in controversy. Appellant insists that under section 164 of the Civil Code here was a conveyance to the wife of property by an instrument in writing; that the presumption is therefore that title to this property vested in her as her separate property. This is quite true. It is further argued that if it be shown, or if it is admitted, that the property was paid for out of community funds, there must follow the added presumption to support the presumption of separate property, that the husband intended it as a gift. (*Alferitz* v. *Arrivillaga*, 143 Cal. 646, [77 Pac. 657].) The evidence touching the purchase establishes clearly that the property was purchased and paid for out of community funds, that it was purchased for and used as the family home and that there was no sur-

render of exclusive possession to the wife. (*Nilson* v. *Serment,* 153 Cal. 524, [126 Am. St. Rep. 91, 96 Pac. 315].) There was evidence in abundance showing that all business was transacted by Mr. Weir and none by his wife; that in the case of other lands, title to which stood also in the name of Mrs. Weir, the husband made the contracts for their sale and that the wife made deeds pursuant to his contracts; that in other instances where promissory notes were taken in the name of Mrs. Weir, the moneys for which the notes were given were paid over by Mr. Weir out of the community funds, and when payments were made on the notes they were made to Mr. Weir and receipted for by him. Without further exposition of the evidence, it is sufficient to say that under the rule and doctrine of *Fanning* v. *Green,* 156 Cal. 279, [104 Pac. 308], the finding that the property was community property is fully supported. But if any doubt could be entertained upon this, there can be none over the fact that Mrs. Weir subsequently executed to her husband a deed of this same property. It is said by appellant that if this be so, then the property became the separate property of the husband. For this respondent does not contend and appellant cannot be injured by the finding that it continued to be community property after the conveyance from Mrs. Weir to her husband. Respondent's position in this regard is throughout consistent. His position is that the property was community property and when conveyed to Mrs. Weir continued as community property while the title stood in her name and did not change its character as community property by the transfer of that title to the husband in whom the general control over community property resides. The facts establishing the conveyance are in evidence principally from the testimony of Miss Hammond, a daughter of a niece of Mr. Weir who from time to time resided with the Weirs. At the time of the making of the deed she was about twenty years of age, was a student at Stanford University and had been financially assisted by Mr. Weir in maintaining herself at that University. She testifies that she was present at a conversation between her uncle and his wife, when, taking advantage of the fact that she would remain at the Weir home, Mrs. Weir proposed to visit some friends in San Diego and to execute a deed to her husband before a Mr. Mouser (a notary public of San Diego whom the Weirs

knew well) of the Westlake residence. Miss Hammond testifies: "She said to him that she was going to San Diego and execute this deed before Mr. Mouser of the Westlake residence. That was the last piece of property that was not deeded back to Mr. Weir." Mr. Mouser testifies that Mrs. Weir came to his office on June 21, 1905, to execute this deed. His notarial record establishes the execution of a deed from Nancy A. Weir to Merrill A. Weir, her husband, granting the property in controversy. Mr. Mouser testified that Mrs. Weir signed the deed in his presence and acknowledged it, that the deed was in the handwriting of her husband, and that he "instructed her, and talked the matter over with her that it would be necessary to deliver the deed to him in order to vest title. I further told her that in the event of his death prior to hers the deed need not be recorded, if delivered, and would vest the title in him, and should he die first, that she could destroy the deed and nobody would be injured by it, and the record of the title to the property would stand in her name." Mrs. Weir, Mr. Mouser testified, left with the intention of delivering the deed to Mr. Weir, and then, if he died first, of destroying it. Upon her return from San Diego Miss Hammond testifies that Mrs. Weir said: "Uncle Merrill has the paper that I brought back from San Diego with me, and he is looking it over now, and I hope that it is all right for it is the first time that I ever executed anything of the sort alone." Miss Hammond saw her uncle looking over the paper. He folded it up, put it in his pocket, and in answer to Mrs. Weir's question if it was all right, said: "Nan, you did just as I told you; it is all right." Mrs. Weir told Miss Hammond that she had executed the deed and that the paper which Mr. Weir had and was reading was that deed. The deed was not placed of record, but possession of it was retained by Mr. Weir, and it was probably placed by him in the tin box which was the receptacle of his private papers and other cherished personal effects. The deed was not found after his death, but the evidence leaves no doubt but that Mrs. Weir in furtherance of the understanding between herself and her husband took it from his papers after his death and destroyed it, thus leaving the record title to the property still in herself. The method and plan of the Weirs to avoid probate in the event that either of them should die is thus outlined in the testimony of their

confidential friend, Mr. Mouser: "He (Mr. Weir) said that he intended to keep control of the ownership of his property so long as he lived. He only wanted this instrument (referring to a bill of sale)' so that his wife, in case that he died first, might be in condition to claim the property, and make such disposition of it as they had mutually agreed upon. He further stated in the same conversation that he did not propose to have his property in shape that in case of her death before his, he would have to go through court and probate to get it back. He proposed to keep control of it while he lived. . . . He said that he proposed to keep it himself as long as he lived, and keep control of it and the interest of it as long as he lived; he did not propose to have to go into probate court to get back his own property."

Appellant, however, earnestly contends that there was a failure of evidence to show a delivery by Mrs. Weir to her husband of the deed with an intent to divest herself of her dominion and control over the property beyond power of recall, or immediately to vest him with title to it. Whether the delivery of an instrument has actually been made or not is a question of fact. The finding in this case is that the delivery was so made. If that finding receives substantial support from the evidence our inquiry here is at an end. What that evidence does disclose, epitomized, is this, that Mrs. Wier took a deed drawn by her husband to the property in question from herself, as grantor, to him, as grantee, and went to an intimate friend, a notary in San Diego, for the purpose of acknowledging it before him. She did acknowledge it and she was instructed by the notary that in order to vest title in her husband it would be necessary for her to deliver the deed to him. She was further told that the deed, if delivered, would vest title in him without the need of recordation, but if so delivered and not recorded and her husband died first, she could destroy the deed and "nobody would be injured by it and the record title would stand in her name." Mrs. Weir with this knowledge comes back to her husband with the instrument and gives it to him. She desires to know if she has correctly obeyed his instructions, and is informed that she has done so. Mr. Weir retains possession of the deed, does not place it of record, and upon his death it is destroyed by his wife.

In support of the contention of non-delivery, appellant relies on *Kenney* v. *Parks,* 125 Cal. 146, [57 Pac. 772], and 137 Cal. 527, [70 Pac. 556], and *Elliott* v. *Murray,* 225 Ill. 107, [80 N. E. 77]. In *Kenney* v. *Parks,* the court found that an intent to deliver and thus presently to vest title was absent for several reasons: 1. That both parties believed that the deeds could have no effect to transfer title until recorded; 2. That the deeds "were placed in the possession of her husband upon the understanding that they were to have effect only and upon the contingency of her death before that of her husband." In *Elliott* v. *Murray* there was a like situation. Says the supreme court of Illinois: "The deed was made, not with the intention that it should immediately take effect and pass title to said farm, but that it should only take effect in case he survived his wife, and in the event that his wife should survive him, it was never to take effect but was to be destroyed. . . . We think it clear that the parties to this deed intended it to operate as a will and that the possession of the deed by the grantee did not have the effect to vest the title to said farm in him." In the case at bar, however, no such mistake of fact or misunderstanding of the law is disclosed. The wife was correctly informed that the delivery by her of the deed to her husband would immediately vest title to the property in him; that if the husband should die while her deed to him remained unrecorded she could by destroying the deed destroy all evidence of the transfer of title and the record title to the property would thus stand in her name and "nobody would be injured by it." It was under these circumstances that the delivery was made. It was a delivery designed to effect a present transfer of title. There is not here even shown the not uncommon mistake of supposing that by a destruction of the unrecorded instrument title would revest. It was the typical case above adverted to whereby by the destruction of evidence,—namely, the unrecorded deed, and by the suppression of other evidence,—namely, by the silence of the wife, title would apparently stand of record in the wife, and, as under such circumstances an innocent purchaser would be protected, therefore, "nobody would be injured." But, as has been said, such transactions as this which are in their essence frauds upon the law and may operate to work great wrong upon creditors and other parties in interest, when subjected

to analysis before a court of law will be given only their legal force and value without consideration of the innocence of the design or the absence of an actual fraudulent intent. *Kenney* v. *Parks* rests, and must rest, for the soundness of its decision upon the elements of fraud and upon the mutual mistake of the parties whereby neither believed that even a delivered deed operated to transfer title until recordation, a mutual mistake which conclusively established the absence of an intent to create a present and a new vestiture of title. *Elliott* v. *Murray* is in conflict with own uniform rule of decision. Thus in *Mowry* v. *Heney,* 86 Cal. 471, [25 Pac. 17], the trial court found that the intent of the grantor was that the deed should not take effect at all except in case of her death and that in such case it should operate in lieu of a will and take effect after her death, and, further, that it was executed "to avoid an administration of her estate in the event of her death and for no other purpose," the very facts and circumstances which, to the minds of the supreme court of Illinois, established non-delivery. Yet by this court in Bank, it was said: "Here was an absolute deed to the property, delivered to the grantee. Its legal effect was to vest in the plaintiff the title to the property, free from any conditions. The effect of the finding, if upheld, is to vary the terms of the deed and render it one upon condition, and defeat its operation by parol proof on the part of the grantor that it should have an effect different from that apparent on its face. This cannot be done. Mr. Devlin, in his work on deeds, says: 'Whether a deed passes a title or not must be determined by its legal effect. If it has been executed and delivered, its effect is determined by its language. When so executed and delivered its legal effect as to the passing of the title is not altered by the fact that one objection to the transaction was to save the expense and trouble of administration upon the grantor's estate after his death. And where a grantor executed a deed for this purpose to his wife, the fact that she placed the deed after delivery where her husband, equally with herself, could have access to it, does not change its legal effect as a conveyance.' Devlin on Deeds, sec. 284."

In *Dimmick* v. *Dimmick,* 95 Cal. 323, [30 Pac. 547], the controversy was over the effect of a deed delivered by a husband to the wife. This court said: "Conceding he believed

that if she should die first he could conceal or destroy the deed and thereby revest the title in himself, still such fact does not militate against the sufficiency of the delivery at the date of the conveyance, or destroy his clear intention to part with the title and vest the same in her."

In *Tyler* v. *Currier*, 147 Cal. 31, [81 Pac. 319], the wife executed a deed in favor of her husband, the defendant, and afterwards died. The plaintiff, an heir at law of the wife, sued to have the deed annulled on the ground, among others, that it was not delivered in the lifetime of the wife. It was shown that the deed had been placed in the possession of the husband. He gave testimony that he had not recorded the deed "for fear that he might die first," and that his "idea was that if it was not recorded his wife could destroy the deed and revest herself with the title." Upon this evidence the plaintiff insisted, as here, that the delivery was not made with intent to pass title, but this court said: "There is no merit in this contention. The fact that respondent had the erroneous notion that if he should die before his wife and that after his death she should get possession of the deed and destroy it, the title would revest in her, has no pertinency to the issue of the delivery of the deed."

Thus it is plain that, even if Mrs. Weir had mistakenly supposed that by the destruction of her deed to her husband after its delivery she could reinvest herself with title, nevertheless, her mistake could not be permitted to impair the legal effect of such delivery. But this case is weaker than those cited in that it is made to appear that Mrs. Weir was not laboring under any mistake, that she was correctly informed as to the law, and thus knew that the destruction of the deed would only accomplish an apparent re-establishment in her of the title.

Some consequence is attached by appellant to the declaration of a witness that in 1894 he heard a statement by Mr. Weir to Mrs. Weir to the effect "that he was transferring his property in her name in order to protect himself against the liabilities that might occur in the banks in the east." The only significance that could pertain to this testimony is that it was designed to show that the deed taken by Mrs. Weir to the property at the instance of her husband was so taken in fraud of the rights of eastern creditors. But no such defense was

pleaded, and it is well settled that when fraud is relied on as an element of defense and invoked as conferring a right against the plaintiff it must be alleged. (*Frink* v. *Roe,* 70 Cal. 297, [11 Pac. 820]; *Wetherly* v. *Straus,* 93 Cal. 283, [28 Pac. 1045].) Moreover, the deed by which Mrs. Weir obtained title to the property here in controversy was made seven years after. This property could not have been in the mind of Mr. Weir as a part of the property which he proposed to transfer to avoid liabilities, and there being no proof in the case even that the liabilities existed, much less that they continued, there can be no possible ground for saying that Mr. Weir's business transactions years after were influenced by their suppositive existence.

Reliance is placed upon certain death-bed declarations of Mr. Weir to the effect that it was unnecessary that he should make a will; that his wife had everything and that he had given or had left everything to his wife. Suffice it to say that these were but expressions of the belief of Mr. Weir as to what he had done or accomplished and could exercise no controlling influence in determining what in fact he had or had not done or accomplished.

It is urged that the court erred in overruling defendant's objection to the admission of the notarial record of Notary Mouser, which record, it will be remembered, showed his acknowledgment to the deed by Mrs. Weir to her husband; and also that the court erred in admitting the parol evidence of Mr. Mouser touching the contents of the deed. It is not here contended, as of course it could not successfully be, that the evidence was not admissible to show the terms and nature of a written instrument admitted or proved to have been lost or destroyed, but it is said that there is no evidence in the record to identify the "paper" which Miss Hammond testified was handed by Mrs. Weir to her husband on her return from San Diego with the deed of conveyance. But the evidence is abundant to show that she went to San Diego with such a deed, that she executed such a deed before Mr. Mouser, that she told her (the witness) that she had executed the deed, and that that was the paper, "that" referring to the paper which she had handed to her husband which he read, approved, and placed in his pocket. It is further in evidence that after the death of her husband she stated that she had

destroyed her deed to him. The evidence was, therefore, clearly admissible.

Case numbered 52,999. The personal property in controversy in this case consisted of stock in mining companies, water companies, industrial companies, banks, certain bonds of the United States government, promissory notes, household furniture and moneys in bank; also, $880 in gold coin found secreted in the cellar of the Weir's residence after the death of both spouses. Of the stock some of it was issued to M. A. Weir and bore his general indorsement. Other shares were issued to Nancy A. Weir and bore her general indorsement. The promissory notes for the most part were made payable to the "order of M. A. Weir or Nancy A. Weir." The court found as to all this that it was community property. No useful purpose, we think, would be subserved by treating the items separately. Under the circumstances shown the presumption of the law is that it was community property. (*Fennell* v. *Drinkhouse,* 131 Cal. 447, [82 Am. St. Rep. 361, 63 Pac. 734]; *Freese* v. *Hibernia etc. Society,* 139 Cal. 394, [73 Pac. 172]; *Bashore* v. *Parker,* 146 Cal. 525, [80 Pac. 727].) The facts of compelling force in support of the finding are those above adverted to; that the property was acquired by the spouses during coverture and not by gift, devise, or descent, that Mr. Weir attended to all business and maintained to the end the absolute dominion and control of the property in all its phases, that his wife was utterly ignorant of, and unversed in business, so that she did not know the difference between a deed and a mortgage and a promissory note; that when a promissory note would be taken in the name of Mrs. Weir as payee the money which the note represented was community money; Mr. Weir would retain the possession of the note, would receive the money on account of it and indorse the payments in his own hand. In January, 1903, Mr. Weir made and acknowledged before Mr. Mouser an instrument purporting to be a bill of sale to his wife of all the personal property owned by him at the date of the instrument, or which he might thereafter acquire. The circumstances attending the making of this bill of sale were testified to by Mr. Mouser and his testimony has been previously quoted. The paper was given by Mrs. Weir to the defendant with other papers after Mr. Weir's death. There is no evidence of a delivery of the

paper to Mrs. Weir in the lifetime of her husband and there is the strongest inferential evidence that it was not delivered. This evidence is found both in the testimony of Mr. Mouser and from the fact that Mr. Weir after its execution retained full and complete dominion and control over all his personal property down to the very day of his death. It is apparent that this bill of sale was meant to aid in effectuating the plan of the Weirs whereby upon the death of either the other might succeed to all the property without probate. But it was no part of that plan that Mr. Weir should ever actually part with title, dominion, and control of any of his property. It was still to remain community property, and the evidences and *indicia* of a change of ownership were not real, but were feigned, to aid the result sought to be accomplished. In the case of the land the evidence is strong and convincing that Mrs. Weir delivered the deed which transferred the title to her husband. In the case of the personal property it is equally strong that the husband did not deliver the bill of sale nor any part of the personal property, nor in any way surrender the full rights of dominion and control over it which as community property he was authorized to exercise. The rulings of the court in admitting and rejecting evidence were sound and without prejudice to the appellant.

The judgments and orders appealed from are therefore affirmed.

Lorigan, J., and Melvin, J., concurred.