[Civ. No. 5957. First Appellate District, Division Two.—September 19, 1927.]

GERTRUDE R. BLACKLEDGE, as Administratrix, etc., Appellant, v. MAY J. McINTOSH, Respondent.

John E. Carson and Munson T. Case for Appellant.

Milton M. Cohen and Jerome H. Kann for Respondent.

PRESTON, J., *pro tem.*—Two appeals are here presented under one record, an appeal by plaintiff from a judgment of nonsuit in one case and from a judgment in favor of defendant in the other.

Plaintiff brought one action as administratrix of the estate of her mother, Ellen M. McIntosh, deceased, to cancel certain deeds made by her mother to her sister, May J. McIntosh, the defendant. Plaintiff also brought another action, in the same capacity, against defendant for an accounting for certain personal property and the proceeds of the sale of certain other real property, which plaintiff alleged belonged to the estate of her mother, Ellen M. McIntosh, which had been sold by defendant and the proceeds retained by defendant.

The two cases were tried together by the court, sitting without a jury, with the result above mentioned.

This appeal involves the delivery of four deeds signed and acknowledged by Ellen M. McIntosh, as grantor, to May J. McIntosh, as grantee. The facts are briefly these: Ellen M. McIntosh was a widow and since the death of her husband, which occurred some time prior to November, 1912, had lived with her unmarried daughter, May J. McIntosh, the defendant, and grantee in the deeds in question, in the city of Los Angeles. Ellen M. McIntosh owned several pieces of real property in the city of Los Angeles and one piece of real property in the city of Redlands, all of which she acquired by deed from her husband. She also owned an automobile, household furniture, and had some money in a savings bank.

Mrs. McIntosh had two other daughters, Gertrude R. Blackledge, the plaintiff herein, and Nettie A. Hewitt, and a son, Carl McIntosh. These three children were all married and resided in different places in southern California, outside the city of Los Angeles. Mrs. McIntosh was at all times on intimate and friendly relations with all of her children. All the children, likewise, had great love and respect for their mother. The children were also all on intimate and friendly relations with one another.

Mrs. McIntosh was greatly affected by the death of her husband and seemed to worry a great deal for fear she would have to live alone the balance of her life. All her

children had married and left her home, except her daughter, May J. McIntosh, the defendant. Mrs. McIntosh stated to defendant within a week or two after her husband's death that if she (defendant) would remain single and live with her as long as she lived she would give her the property. Mrs. McIntosh made the same or similar statements to defendant on several other occasions and she also stated to one or two of her intimate friends that she was going to deed the property to defendant. She also stated to another friend that she had deeded the home in which she and defendant were residing to defendant.

On the 8th of November, 1912, Mrs. McIntosh signed and acknowledged, before a notary public by the name of Schneider, three grant deeds to her daughter, May J. McIntosh, the defendant, purporting to convey to said May J. McIntosh three separate parcels of real estate in the city of Los Angeles. At the same time and before the same notary public Mrs. McIntosh also signed and acknowledged a grant deed to her daughter, Nettie A. Hewitt, conveying to her the Redlands property.

The only testimony in the record relative to the actual manual tradition of these three deeds by Ellen M. McIntosh to the defendant is the testimony of said May J. McIntosh. She testified as follows: "My mother brought them home (the three deeds) from Mr. Schneider's office. She said, 'Here, May, are the deeds that I promised you, and I want you to look them over.' I looked them over and she said, 'What about them?' I said, 'They look all right to me.' Then I said, 'What shall I do with them?' And she said, 'Take good care of them and on my death I want you to record them.' She handed them to me. . . . She had promised me these very soon after my father's death, within a week or two, and I think she was afraid she might be left all alone because she told me that if I cared to stay with her that she would give me deeds to the property. . . . I don't remember the time of day she gave me these papers but I think it was around noon. I put them in the desk drawer, the desk that was in the living room. . . . It was a regular roll top desk. The drawer in which I put the papers was what we sort of used as a business drawer, I had mining stock and return checks and a few letters in that drawer. My mother did not tell

me to deposit these deeds in any particular drawer or in any particular place. She says, 'It doesn't matter where you put them just so you take care of them.' We were living then at 4500 Melbourne avenue. The deeds remained there until I told my brother to take them out after her death. We lived in the Melbourne avenue property about nine months after the date on which I say I got the deeds from my mother. From there we went to 1030 Hyperion avenue. . . . When we moved to 1030 Hyperion avenue we moved the desk into Mamma's bedroom. . . . It remained there until after her death.''

On June 5, 1913, Mrs. McIntosh signed and acknowledged another grant deed before the same notary public, purporting to convey to May J. McIntosh another piece of property in the city of Los Angeles. This last deed covered the home in which she and the defendant were at that time living and with reference to the actual manual tradition of this deed defendant was also the only witness and her testimony was as follows: ''Several months later (meaning after she received the other deeds), she (her mother) came home with another one and she gave it to me and told me to put it with the other.'' This testimony given by defendant concerning delivery of the deeds in question was corroborated to some extent by the witness Glen Williams, a friend and neighbor of Mrs. McIntosh. He testified that he had two different conversations with Mrs. Ellen M. McIntosh, in one of them Mrs. McIntosh said to him: ''I suppose that a lot of friends and neighbors are wondering why May does not get married. I am really responsible for May not getting married. I told May that if she would stay single as long as I lived that I would provide for her.'' In the other conversation Mr. Williams stated to Mrs. McIntosh that she had ''a nice home'' and Mrs. McIntosh replied, ''Yes, don't you think May ought to be happy with this? I have deeded it to her.''

Ruth B. Hall, a friend and acquaintance of Mrs. McIntosh, testified to having several conversations with Mrs. McIntosh with reference to the property and with reference to the defendant. In one of these conversations, which took place about a year before Mrs. McIntosh died, Mrs. McIntosh stated to Miss Hall that ''she felt responsible for having made Miss McIntosh (the defendant) dependent

upon her for a living and she had made arrangements so that she (May McIntosh) would not be dependent on others.''

Nettie A. Hewitt, a daughter of Mrs. McIntosh, testified that she had a conversation with her mother prior to 1919, in which her mother stated, ''I don't know why I am telling you this, Nettie, but I have just been to Mr. Schneider and made a deed to the Redlands property to you. The other deeds are in May's name and I have talked the matter over thoroughly with Carl.''

Carl McIntosh, the son of Ellen M. McIntosh, deceased, was a witness for plaintiff and testified as follows: ''The signing or execution of these deeds first came to my knowledge about eighteen months previous to my mother's death. . . . My mother said to me, 'Sonny, if anything should happen to me take those deeds and record them. I want May to have the income from these different properties. So long as she needs it and remains single and so long as she lives. . . . ' These deeds came into my possession on the occasion of my mother's death. . . . I would say three or four days thereafter. I got them out of the drawer of the desk in her own private room. I knew they were there, because she had previously told me they were there. She told me this from time to time back as far as eighteen months previous to her death and right down to within a very few weeks, possibly two or three weeks immediately before her death. . . . I took the deeds from this drawer, in which my mother had indicated they were, and proceeded to place them in escrow with the Title Insurance Company, here in Los Angeles with instructions to record the deeds . . . ''

The evidence in this case also shows that Mrs. McIntosh, after the execution of these deeds, paid the taxes upon the property herself and appeared in an action involving one of the pieces of property as legal owner thereof; collected rents from some of the properties; made repairs and improvements upon another piece of the property; made returns to the assessor for assessment purposes as the legal owner of the property, etc.

All these facts, while tending to show a continuing claim of title by Mrs. McIntosh to the property theretofore conveyed to defendant, were merely circumstances to be weighed

by the trial court against the affirmative evidence of delivery given by defendant. These facts taken with the other facts testified to by defendant and her witnesses did no more than raise a conflict of evidence on the vital issue of the sufficiency of the delivery of the deeds to pass title to the defendant, and the trial court having resolved that conflict in favor of the defendant, such a finding will not be disturbed by this court where there is any substantial evidence to support it. (*Hotaling* v. *Hotaling*, 193 Cal. 368 [224 Pac. 455]; *McCarthy* v. *Security Trust etc. Bank*, 188 Cal. 229, 233 [204 Pac. 818]; *Follmer* v. *Rohrer*, 158 Cal. 757 [112 Pac. 544]; *Avery* v. *Avery*, 42 Cal. App. 100 [183 Pac. 453].).

 The legal requirements to effect a valid delivery of a deed has often been stated by the supreme court of this state. In *Williams* v. *Kidd*, 170 Cal. 631, 638 [Ann. Cas. 1916E, 703, 151 Pac. 3], the supreme court states the rule as follows: "It is essential to the validity of the transfer of real property that there be a delivery of the conveyance with intent to transfer the title, and the true test under which delivery is to be determined is in ascertaining whether in parting with the possession of the conveyance the grantor intended thereby to divest himself of title. If he did, there was an effective delivery of the deed. If not, there was no delivery. The solution of this question is grounded entirely on the intention of the grantor, and this essential matter of intention is a question of fact to be determined by the trial court from a consideration of all the evidence in a given case bearing upon the question." (See, also, *Bury* v. *Young*, 98 Cal. 451 [35 Am. St. Rep. 186, 33 Pac. 338]; *Kenniff* v. *Caulfield*, 140 Cal. 34 [73 Pac. 803]; *Estate of Cornelius*, 151 Cal. 552 [91 Pac. 329]; *Follmer* v. *Rohrer*, 158 Cal. 757 [112 Pac. 544]; *Reed* v. *Smith*, 125 Cal. 491 [58 Pac. 139]; *Black* v. *Sharkey*, 104 Cal. 279 [37 Pac. 939]; *Hibberd* v. *Smith*, 67 Cal. 547 [56 Am. Rep. 726, 4 Pac. 473, 8 Pac. 46]; *Denis* v. *Velati*, 96 Cal. 223 [31 Pac. 1]; *Hotaling* v. *Hotaling*, 193 Cal. 382 [224 Pac. 455].)

 We think the evidence in this case meets all the requirements of the law and that it amply justified the finding of the trial court, that there was a sufficient delivery of the deeds to pass title to defendant, when all the facts and circumstances of the case are considered.

What the intent of Ellen M. McIntosh was in handing over the executed deeds to her daughter was a question of fact for the trial court under all the circumstances of the transaction, and the finding of the trial court that it was the intent of Mrs. McIntosh to pass an absolute title was a fair inference from all the facts. Appellant places great reliance on the testimony of Carl McIntosh to establish a want of intention on the part of Mrs. McIntosh to convey an absolute title to the property to May J. McIntosh. In the first place, the testimony of Carl McIntosh that the deeds were in the possession of his mother at the time of her death is flatly contradicted by the defendant. In the second place, Carl McIntosh never knew that his mother had made the deeds until about eighteen months before her death, which was more than six years after they were executed and given to defendant. This evidence could only be admissible for the purpose of assisting the trial court in determining the intention of Ellen M. McIntosh at the very time she handed the deeds to defendant, and could in no way vary or defeat the title conveyed, if the deeds had theretofore been effectively delivered. The law is well settled, where a deed, absolute in form, is delivered by the grantor to the grantee personally, title vests in the grantee, discharged of any condition on which the delivery was made. Section 1056 of the Civil Code provides: "A grant cannot be delivered to the grantee conditionally. Delivery to him, or to his agent as such, is necessarily absolute, and the instrument takes effect thereupon, discharged of any condition on which the delivery was made."

In *Mowry* v. *Heney,* 86 Cal. 471 [25 Pac. 17], the court said: "Here was an absolute deed to the property *delivered* to the grantee. Its legal effect was to vest in the plaintiff the title to the property free from any condition."

In Devlin on Deeds, section 314, it is said: "A deed cannot be delivered to the grantee as an escrow. If it be delivered to him it becomes an operative deed, freed from any condition not expressed in the deed. It is and will vest the title in him, although this may be contrary to the intention of the parties." (See, also, *Hammond* v. *McCollough,* 159 Cal. 639 [115 Pac. 216]; *Bias* v. *Reed,* 169 Cal. 33 [145 Pac. 516]; *Elliott* v. *Merchants' Bank & Trust Co.,* 21 Cal. App. 536 [132 Pac. 280]; *Lewis* v. *Brown,* 22

Cal. App. 38 [133 Pac. 331]; *Riley* v. *Northern Star Mining Co.*, 152 Cal. 549 [93 Pac. 194]; *Avery* v. *Avery, supra.*)

█ The foregoing decisions afford ample authority for the holding that any oral agreement or understanding that Mrs. McIntosh may have had with her daughter that the deeds should not be recorded until after her death or that the daughter should only have the rents or income from the property so long as she remains single and was in need of such income is immaterial and could have no effect upon the delivery, because the deeds were absolute in form and could not be delivered to the grantee *conditionally.* Delivery to her is necessarily absolute and the instruments took effect immediately *discharged of any condition on which delivery was made, not expressed in the instruments themselves.* The effect of the evidence of Carl McIntosh would be to vary the express terms of the deeds by parol evidence. Evidence of this character cannot be allowed for any such purpose. The legal effect of a written instrument cannot be varied or defeated in whole or in part by parol evidence (*Hendrick* v. *Crowley*, 31 Cal. 475; *Mowry* v. *Heney, supra; Winchester* v. *Winchester*, 175 Cal. 391 [165 Pac. 965]), except, of course, that parol evidence is admissible to show the true consideration in a deed. (Code Civ. Proc., sec. 1962, subd. 2.) The above evidence, however, was not offered for the purpose of showing the true consideration.

█ The deeds would pass title without recording. Recordation has no other function than that of notice to the world; and an unrecorded deed is valid as between the parties thereto and those who have notice thereof. (Secs. 1213 and 1217, Civ. Code; *Burkett* v. *Doty*, 32 Cal. App. 337 [162 Pac. 1042]; *Avery* v. *Avery, supra; Lewis* v. *Brown, supra.*) █ Therefore, there is no merit in the contention of appellant that Mrs. McIntosh only intended that her daughter acquire a qualified estate in the property. No such intention is expressed in the deeds and we have seen the deeds were grant deeds absolute in form and delivered by the grantor to the grantee personally. The legal effect of such a delivery is to pass a fee-simple title to the grantee. (Secs. 697, 762, and 1105, Civ. Code.) With this fee-simple estate passed also the present absolute right to all the rents and profits of the property conveyed, free from any claim of the grantor thereto.

The cases relied upon by appellant only reaffirm the well-established rule that a deed must be delivered with the intention on the part of the grantor to pass a present irrevocable title to the property conveyed to be an effective delivery, and whether such intention was shown depends upon all the facts and circumstances of the particular case.

We do not deem it necessary to discuss in detail the further circumstances pointed out by appellant, which she claims support her contention that Mrs. McIntosh never intended to convey to her daughter an absolute title to the property. As we have already pointed out, these were mere circumstances to be weighed by the trial court against the affirmative evidence of delivery.

No contention is made by appellant as to the correctness of the trial court's order in granting the nonsuit as to the personal property, and we are unable to find any evidence in the record touching the disposition of the personal property in question, so we must assume that the court's ruling granting the nonsuit was correct.

We think the judgment in both cases should be affirmed, and it is so ordered.

Koford, P. J., and Sturtevant, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 17, 1927.