Filed 2/23/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SHARON MCMILLIN, | B298990 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NC060255) |
| v. | |
| SOM RATHMENY EARE, | ORDER |
| Defendant and Appellant; | |
| JOSHUA NATHAN MCMILLIN, | |
| Defendant and Respondent. | |

The parties' joint motion filed February 17, 2022, to recall the remittitur and modify the opinion is granted. The remittitur, filed December 29, 2021, is recalled for the purpose of modifying the opinion to correct a clerical error.

While the general rule is that an appellate court loses all control and jurisdiction over a cause after the remittitur has been issued (*Rare Coin Galleries, Inc. v. A-Mark Coin Co., Inc.* (1988) 202 Cal.App.3d 330, 336), on a party's or its own motion and for good cause, the court may order recall of a remittitur (Cal. Rules of Court, rule 8.272(c)(2)). The recall may be ordered for the correction of clerical error or on the ground of fraud, mistake, or inadvertence. (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 165.) Recall of the remittitur reinstates the appellate court's jurisdiction. (*Id.* at pp. 165–166.)

Good cause appearing therefor,

IT IS HEREBY ORDERED the third paragraph of the Disposition is vacated and modified to read:

"The judgment quieting title to the Gundry and Anaheim properties in favor of Sharon is reversed with directions to enter a new judgment quieting title to the properties in favor of Joshua, per the July 29, 2010 Gundry deed and the July 18, 2011 Anaheim deed. The judgment is also reversed as to the causes of action for slander of title, declaratory relief, and cancellation of deeds."

In all other respects, the opinion is unchanged.

_____
GRIMES, Acting P. J.          WILEY, J.          STRATTON, J.

Filed 9/30/21; Certified for Publication 10/25/21 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| SHARON MCMILLIN,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SOM RATHMENY EARE,<br><br>    Defendant and Appellant;<br><br>JOSHUA NATHAN MCMILLIN,<br><br>    Defendant and Respondent. | B298990<br><br>(Los Angeles County<br>Super. Ct. No. NC060255) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Reversed and remanded with instructions.

Law Offices of David J. Duchrow and David J. Duchrow; The Law Offices of Marc Coleman and Marc Coleman for Defendant and Appellant Som Rathmeny Eare.

The Law Office of Curtis W. Herron and Curtis W. Herron for Plaintiff and Respondent Sharon McMillin.

No appearance by Defendant and Respondent Joshua McMillin.

_____

This is a dispute over ownership of two parcels of real property. The disputing parties are a wife, her husband, and the husband's mother. What started as a contentious dissolution over community property and third-party interests in the two real properties evolved into a civil complaint and cross-complaint, each seeking to quiet title to the two properties. The case is further complicated by numerous notarized grant deeds executed by individuals transferring titles to one another. Because we disagree with the trial court on the validity of the oral conditions attached to the challenged deeds, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Relevant Factual Background*

In 2007, Joshua McMillin met Som Eare. They married on October 19, 2007. Joshua McMillin and Sarah McMillin are adult siblings. Their mother is Sharon McMillin.[1]

Two parcels of real property are at issue. The first is located at 1620 Gundry Avenue in Long Beach, California (Gundry property); it is a four-plex that generates rental income. The second is a residential property located at 2153 E. Anaheim Street in Long Beach, California (Anaheim property).

B. *Dissolution Action*

On October 22, 2013, Som filed a petition for dissolution of her marriage to Joshua, case No. ND071535. Som obtained a restraining order against Joshua, requiring him to move out of the house they lived in—the Anaheim property.

---

[1] Because the parties share the same last name, we refer to them by their first names. While Som is sometimes referred to as Laura McMillin in the record, we refer to her as Som.

On October 7, 2014, during a hearing on Som's Request for Order re: exclusive use and control of the Anaheim residence, Joshua and Som stipulated that Maga View, Inc.—a company Som owned and operated prior to her marriage—held title to the Anaheim property at one point during the marriage. The family law court found the issue of property ownership to be an issue for trial. Som was awarded use and possession of the Anaheim property pending trial and Joshua was ordered to contribute $1,717 toward the monthly mortgage.

## C. *Civil Action*

Before the dissolution action was concluded, Sharon filed a civil complaint on August 31, 2015 against Joshua and Som, alleging six causes of action: theft in violation of Penal Code section 484, subdivision (a); slander of title; constructive trust; declaratory relief; quiet title; and cancellation of deeds. She alleged the following:

### 1. The Gundry Property

On May 17, 2010, Sharon purchased the Gundry property and took title in her name. Two months later, on July 29, 2010, she "executed a notarized Grant Deed which, if recorded, would convey the Gundry [property] to her son, Joshua." Sharon "instructed Joshua to safely hold the [grant deed], and to not record it until and unless such time as either [Sharon] died or Joshua purchased the Gundry [property] from [her]." At the time she gave the grant deed to Joshua, she "did not intend to deliver it to Joshua for the purpose of immediately passing title to Joshua or to any other person or entity." Joshua had "agreed to safely hold" the grant deed and "to not record it until . . . he purchased the Gundry [property]" from Sharon or upon her

3

death.  Sharon "never received any consideration" for the transfer of any interest in the Gundry property.

### 2. The Anaheim Property

On August 31, 2010, a revocable land trust called 2153 E. Anaheim S. J. McMillin Trust (Trust 1) was created, naming Joshua as the trustee and Sharon as the beneficiary.  On September 8, 2010, Trust 1 purchased the Anaheim property and took title in the name of the trust.

Sharon wanted, but was unable, to refinance the Anaheim property.  She thus "agreed" with Joshua and her daughter Sarah "that the [Anaheim] property would be transferred to Sarah, that Sarah would refinance the property, and that the property would subsequently be transferred back" to Sharon.  They agreed that Sarah and Joshua would hold title to the Anaheim property in trust for Sharon, and that Sharon would be the "equitable owner" of the property at all times.  Any transfer of the property "would be made without consideration as an accommodation only for the purpose of refinancing the property."  Sharon referred to this agreement between her, Joshua, and Sarah as the "Refinancing Agreement."

Sharon alleged:  "In performance of the Refinancing Agreement, a number of purported transfers of the Anaheim [property] were made."  On September 17, 2010, Trust 1 transferred title to the Anaheim property to Sharon via a notarized grant deed.  Three days later, on September 20, 2010, Sharon transferred title to the Anaheim property to Sarah via grant deed.  Joshua—acting as Sharon's "attorney in fact" and "Trustee on behalf of [Trust 1]"—recorded both deeds on October 13, 2010.

4

The following year, on June 2, 2011, 2153 E. Anaheim Street Long Beach Trust (Trust 2) was created, naming Joshua as the trustee and Sharon as beneficiary.

On July 18, 2011, Sarah—"on behalf of [Sharon], for estate planning purposes"—executed a grant deed transferring the Anaheim property to Joshua. That same day, Sarah signed another grant deed transferring the Anaheim property to Trust 2. The following year, on July 12, 2012, Sarah recorded the deed transferring the Anaheim property to Joshua. More than a year later, on October 16, 2013, Sarah recorded the deed transferring the Anaheim property to Trust 2.

Throughout her complaint, Sharon refers to all the executed, notarized grant deeds between her, Sarah, Joshua, and Trusts 1 and 2 as "void" or "purported" transfers or "incorrectly" transferred property. According to Sharon, the deeds had "no effect to transfer any title interest" because Sharon remained the owner of the Anaheim property since her initial purchase on October 13, 2010. Sharon had "instructed Joshua to safely hold" the July 18, 2011 grant deed transferring the Anaheim Property from Sarah to Joshua and "to not record it until . . . either [Sharon] died or Joshua purchased" the Anaheim property from Sharon. Sharon "did not intend to deliver [the deed] to Joshua for the purpose of immediately passing title to Joshua."

On October 16, 2013, Som recorded the July 29, 2010 grant deed transferring the Gundry property from Sharon to Joshua and the July 18, 2011 grant deed transferring the Anaheim property from Sarah to Joshua with the Los Angeles County Recorder's Office. This was done "without [Sharon's] knowledge or permission."

Based on the foregoing, Sharon alleged Som "feloniously stole and fraudulently appropriated property which was entrusted to her," i.e., the deeds to the Gundry and Anaheim properties. In recording the deeds with the Los Angeles County Recorder's Office, Som "knowingly and designedly, by false pretense, defrauded [Sharon] of her real property"—which Sharon alleged constitutes a violation of Penal Code section 484, subdivision (a). This was the foundation for the cause of action for theft.

As to slander of title, Sharon alleged Som "willfully, wrongfully, [and] without justification" caused the grant deeds to the two properties to be "published and recorded" with the Los Angeles County Recorder's Office. In doing so, Som "attempt[ed] to falsely characterize the Gundry [property] and the Anaheim [property] as community property jointly owned by Som and her husband, Joshua." The grant deeds to the two properties were "void" and "false," causing "doubt to be cast on [Sharon's] title" to both properties.

As to the causes of action for unjust enrichment and constructive trust, Sharon alleged Joshua and Som were "unjustly enriched and have benefited at the direct expense" of Sharon because the two properties were solely owned by Sharon and were never purchased by Joshua or Som. As a result of Som's "fraudulent and malicious slander" of Sharon's title to the properties, Som is an involuntary trustee, holding the properties, their rents, issues, royalties, and profits in constructive trust for Sharon, "with the duty to convey" them back to Sharon.

As for the request for declaratory relief, Sharon asked the court to make "a judicial determination" declaring her the sole owner of the Gundry and Anaheim properties. With respect to the quiet title cause of action, Sharon alleged Joshua and Som

6

have claimed an interest adverse to Sharon's title in both properties "without any right," and sought to establish her title free and clear.

Finally, Sharon asked the court to cancel the two deeds Som recorded with the Los Angeles County Recorder's Office on October 16, 2013: the July 20, 2010 grant deed transferring the Gundry property to Joshua (the Gundry deed) and the July 18, 2011 grant deed transferring the Anaheim property to Joshua (the Anaheim deed). Sharon alleged Som knew at the time of recording that Sharon "did not intend for Som or Joshua to have any interest" in either property until Sharon's death or until Joshua purchased the properties from Sharon.

D.     *Cross-Complaint*

On October 20, 2015, Som filed an amended cross-complaint against Sharon, Joshua, and Sarah seeking, among other things, to quiet title to the two real properties and to set aside fraudulent transfers. The trial court entered judgment against Som on the cross-complaint, finding her not credible. We do not discuss the cross-complaint as it is not before us on appeal.[2]

E.     *The Dissolution Judgment*

In the meantime, the judgment of dissolution filed on September 11, 2018 in Som's and Joshua's family law case included the following terms:

---

[2]     In her opening brief, Som presents 10 arguments on appeal; none of them raise issues about the cross-complaint. For that reason, we do not address the cross-complaint beyond this point.

7

- The court found Joshua's "credibility to be worse than that of" Som.

- The court found "the balance of the hardships to favor [Som].  [Som] brought significant money and property into the marriage and it produced income.  [Joshua] brought no assets into the marriage and inhibited [Som's] income by his actions [and Som] runs her nonprofit out of the residence she occupies [i.e., the Anaheim property]."  The court "will not remove her from the residence until the issue of its ownership is decided."

- Som was "awarded exclusive use and possession of the Anaheim property . . . pending the conclusion of the civil case" and "shall be reinstated as a beneficiary of the homeowner's policy insuring the Anaheim property."

- "All issues regarding the properties and related transactions not resolved in the civil case are reserved for adjudication in the family law case.  These include *Epstein* credits[3]; *Watts* charges[4]; Family Code § 2640 reimbursement; reimbursement for rent proceeds collected by [Joshua] after separation; reimbursement for all monies paid by [Som] and [Joshua] to claimant [Sharon] during marriage, including but not limited to payments to her home equity line of credit . . . and characterization of the following corporations and trusts related to the Gundry and Anaheim properties:  Maga View, Inc.;  . . . 2153 E. Anaheim Street S. J. McMillin Trust dated August 31, 2010; and 2153 E. Anaheim Street, Long Beach Trust dated June 2, 2011."

---

[3]     *In re Marriage of Epstein* (1974) 24 Cal.3d 76.

[4]     *In re Marriage of Watts* (1985) 171 Cal.App.3d 366.

F.    *Trial of Sharon's Civil Action*

A court trial commenced on February 20, 2019 and continued on February 22 and 26, 2019.  The following relevant testimony was elicited.

1.    Sharon's Testimony

Sharon testified in accordance with the allegations of her complaint—that she executed the deeds transferring the properties to Joshua subject to conditions which were not written in the deeds.

As to the Gundry property, Sharon purchased it in her name in July 2010, using money she borrowed from a home equity line of credit (HELOC).  She obtained a mortgage in her name to make the purchase.  Joshua wanted to buy the Gundry property from Sharon.  He "wanted [her] to sign a grant deed . . . saying [she] intended to sell it [to] him" and that the deed "would help him to get the financing to purchase it from [her]."  She confirmed having signed a grant deed on July 29, 2010, which provided: " 'For a full valuable consideration, receipt of which is hereby acknowledged, Sharon J. McMillin, an unmarried woman, hereby grants to Josh McMillin, a married man, the [Gundry] property.' "  Sharon executed the grant deed "with the intention that if he got the financing to purchase the property, that [she] would sell the property to him."  Joshua, however, was unable to obtain financing.

As to the Anaheim property, transfer of title to Joshua was not to be effective until Sharon died or Joshua bought the property from her.  The deed was executed only to assist Joshua in obtaining a loan so he could buy it from her.

Sharon understood Trust 1 would hold title to the Anaheim property.  Joshua told Sharon he "needed to refinance to get a

9

conventional loan" to pay off the former owner, Frank Prior. Sharon did not qualify for the refinance due to her credit rating; thus, Joshua approached his sister Sarah, who was able to obtain the loan. Until 2017, "Josh or Som" made the payments on the loan Sarah took out. Then, "Josh called [Sarah] and told her he had no more money, and he couldn't make the payments, and it would go to foreclosure."

### 2. Sarah's Testimony

Sarah claimed no ownership interest in the Gundry or Anaheim properties. When Joshua asked Sarah to take out a loan on the Anaheim property, she turned him down because she "didn't feel comfortable doing it"—i.e., "putting [her] name on something that is not [her] property." Later, when Joshua had asked her again, she changed her mind and decided to do it. In return, Joshua paid her $3,000 "for [her] to take on that loan." Sarah never spoke to Som about getting the loan; all conversations were with Joshua. Sarah claimed the mortgage interest tax deduction from the loan on the Anaheim property beginning in 2011.

Although obligated on the loan, Sarah "thought [the property] was his still." Joshua told Sarah that he "and Som would pay the monthly mortgages" and that Sarah "wouldn't be responsible for paying them." For a while, Sarah "sent the statements to Josh, and . . . he sent it to Som." There was a time "when Som was still paying, and Josh said he could not so [Sarah] was covering his portion."

Sarah did not "have any clue" at the time she notarized and signed the two grant deeds dated July 18, 2011 that she was granting the same property to two different grantees on the same

10

day. She only signed the grant deeds because her brother asked her to.

### 3. Joshua's Testimony

Joshua believed it was necessary to transfer the Anaheim property to Sarah so that she could apply for a loan to fully pay off Frank Prior, the previous owner of the Anaheim property. Joshua knew Sharon intended title to transfer to Sarah so that Sarah could obtain the loan. The grant deeds "were intended to take effect right away so [that his] sister could get a loan." It was represented to the lender that Sharon "had already titled in her name; that was one of the requirements the lender needed for her to get a loan."

Joshua took possession of the $250,000 Sharon gave him from her HELOC to purchase the Gundry property and deposited it into a bank account he controlled. He did not segregate Sharon's funds from his personal funds so he was unable "to trace the money completely" via bank statements. "There's just too many accounts to fully trace everything that was done."

It was agreed that title to the Gundry property would not be transferred to Joshua and the deed not recorded until he either purchased the property or Sharon died. These conditions were not set out in writing and were not attached to or part of the deed.

Som and Joshua lived at the Anaheim property at some point during their marriage. However, Joshua does not claim to be the owner of either property and believes Sharon is the owner of both.

### 4.    Som's Testimony

In October 2013, Som recorded the grant deed from Sarah to Joshua for the Anaheim property and the grant deed from Sharon to Joshua for the Gundry property.  She recorded at that time because she "had this suspicion that something was happening and [her] properties were being stolen from [her] by the McMillins."  Som had the deeds in her possession in her safe deposit box.  She only altered the return address on the deeds because the County Recorder requested "current" addresses.

Som confirmed she had filed a request for a fee waiver on April 4, 2009 in a prior lawsuit against her stepfather due to "the economic circumstances caused by [her] unemployment."  The fee waiver was granted.  She filed the fee waiver because she had "overextended" herself by paying multiple mortgages on multiple properties, paying for the litigation to defend her title to the Anaheim property, and by financially supporting her disabled husband, her brother, and herself.  She also confirmed she had several tax liens against her personally for the years 2007 to 2011.

### G.    *Trial Court's Ruling*

On April 25, 2019, the trial court issued its tentative decision.  In brief, the court found:

### 1. Credibility

- Som was not credible.  "Where her testimony conflicted with [Sharon's] the court adopts [Sharon's] version as the more credible."

- Som "testified that she used her 'money' to purchase the properties in July and September 2010. [¶] The court finds that [Som's] testimony is not credible. . . . On or about June 12,

2009, she filed [a] Request to Waive Court fees involving a lawsuit against her stepfather." Som claimed "she was indigent and had no funds to pay for the court fees . . . under penalty of perjury." Som "admitted during trial that she had several tax liens against her from 2007 thru 2011. . . . She testified that she did not take care of tax liens until 2014 or 2015. [¶] Based on [Som's] testimony and the exhibits admitted, the court finds that she had insufficient funds to purchase the Anaheim and Gundry Properties in 2010 as she claimed."

2. The Gundry Property

- "The Gundry property was purchased on or about July 22, 2010. Sharon purchased the property with a loan in her name (as reflected in the security instrument – [the Deed of Trust]), and she took title in her name: 'Sharon J. McMillin, an unmarried woman.' "

- "Sharon testified that her son expressed an intention to purchase the Gundry property from her. . . . Sharon signed and provided [the unrecorded deed] to Joshua to allow him to attempt to obtain financing to be able to purchase the Gundry property from her. . . . She credibly testified that she gave him the deed with th[e] understanding that 'if he got the financing to purchase the property, that [she] would sell the property to him.' " (Italics omitted.) The court found that when Sharon gave the deed to Joshua, she did not intend to make an immediate transfer of title within the meaning of the legal term "delivery."

3. The Anaheim Property

- "The Anaheim property was purchased on or about September 10, 2010. Sharon was told by her son that Anaheim

was purchased using Sharon's funds as down payment, and title to Anaheim was placed in a Trust for Sharon."

- "Joshua informed Sharon that they needed to refinance the loan from the previous seller Frank Prior. Sharon attempted to qualify for a loan but was denied due to a 'ding' on her credit. Ultimately, Sharon testified that her daughter Sarah was approached by Joshua, and [Sarah] was able to obtain the loan."

- "With respect to [Trust 1], Sharon testified that she believed Joshua drafted the instrument, and told her it would be advantageous to purchase the Anaheim property in the name of a Trust, and that Sharon herself would be the beneficiary of that trust."

- Sharon never agreed to transfer title to the properties unless and until Joshua obtained the financing to buy her out. She never intended legal delivery or that the deed be recorded.

4. Creation of Cause of Action for Breach of Fiduciary Duty

- "Sharon's claims at trial were for Slander of Title, Constructive Trust, Declaratory Relief, Quiet Title, and Cancellation of Deeds. The Constructive Trust is a remedy and not a cause of action. The court disregards the caption and deems it to be a claim for breach of fiduciary duty. The Slander of Title and Quiet Title causes of action assert the same claim that Sharon owns the properties."

- "Sharon prays for the remedy of a constructive trust with respect to her Cause of Actions (*sic*) for Slander of Title and Quiet Title. [¶] Slander of title does not support the remedy of a constructive trust. The remedy is monetary damages. Quiet Title results in a decree by the court. But a constructive trust is

14

a proper remedy for breach of fiduciary duty and the court's analysis pertains to that theory."

- The court found "Joshua was Sharon's trustee" and received the $250,000 "to be invested by him on Sharon's behalf. [¶] One who receives the money of another to invest on that person's behalf becomes a fiduciary."

- The court also found Som "owed fiduciary duties to Sharon" because the "parties were family members and Sharon reposed trust and confidence in her daughter-in-law. [Som] knew that her husband had received $250,000 from his mother and it was to be invested in his mother's behalf. Moreover, [Som] signed and initialed every page of the Deed of Trust for Sharon's purchase of the Gundry Property." "Both Joshua and [Som] breached their fiduciary duties owed to Sharon by commingling her investment funds and by failing to account for $250,000."

- Som "breached her fiduciary duty by altering and recording the deed." "On October 22, 2013, [Som] filed a petition for divorce against Joshua. . . . A few days earlier on October 16, 2013, she recorded two deeds. . . . The effect of the recordation of these two deeds was to place apparent record title in the name of Joshua, in an over-reaching attempt to make a community property claim in the marital dissolution action." "The deeds . . . were taken by [Som] and recorded without permission of the grantors, thus title did not pass to the Grantees listed on either of those deeds."

5. Constructive Trust

- The court found "the equitable remedy of a constructive trust is appropriate and justified. . . . When Joshua was unable to obtain loans to purchase the properties, the deeds [Sharon] executed was void. Sharon believed Joshua when he

15

told her that the deeds were destroyed. This was an accommodation between two parties in an intimate relationship."

- The court "deems that Joshua currently holds record-title to the Gundry and Anaheim Properties in constructive trust for his mother [Sharon]. He is ordered to refrain from encumbering or transferring said properties except to Sharon."

6. Cancellation of Deeds

- The court found "sufficient grounds exist to [c]ancel" the Gundry Deed and the Anaheim Deed. The court declared that Som, Joshua, Maga View "have no right, title, or equitable interest" in the Gundry and Anaheim properties. It also found Sarah claimed no ownership to either property. The properties "are awarded to Sharon" who "holds paramount title to both properties."

7. Cross-Complaint

- The court found Som "proved none of her causes of action in her cross-complaint by a preponderance of the evidence."

Som filed 13 objections to the trial court's tentative decision. On May 9, 2019, the trial court overruled all objections and adopted its tentative ruling as the final statement of decision.

On June 24, 2019, judgment was entered.

Som's timely appeal followed.

16

## DISCUSSION

A. *The Trial Court Abused its Discretion When It Amended Sharon's Complaint to Include a Cause of Action for Breach of Fiduciary Duty.  The Judgment on the Third Cause of Action is Reversed.*

The trial court amended Sharon's cause of action for "constructive trust", sua sponte, to refashion it as a cause of action for breach of fiduciary duty.  The trial court amended the cause of action via its post-trial tentative statement of decision.

Som contends the trial court's amendment "was not a renaming of an existing cause of action but a new and different claim."  She asserts Sharon's complaint "does not, in substance or form, assert a cause of action for breach of fiduciary duty."  This prejudiced her in that Sharon's complaint did not assert facts that would reasonably put Som on notice for a potential breach of fiduciary duty claim.  She argues the amendment affected her ability to respond, prepare, and defend, as she would have introduced additional evidence/testimony about whether she even owed a fiduciary duty, as well as a statute of limitations defense.

Next, she contends the court's findings that Som owed a fiduciary duty to Sharon are directly contradicted by the testimony of all involved parties.

1. Standard of Review and Applicable Law

It is well established that leave to amend a complaint is entrusted to the sound discretion of the trial court, and that the exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse of discretion.  (*Garcia v. Roberts* (2009) 173 Cal.App.4th 900, 909.)

17

Code of Civil Procedure[5] section 473 authorizes the court to allow a party to amend a pleading "in furtherance of justice, and on any terms as may be proper."  (§ 473, subd. (a)(1).)  Section 473 also provides the court "discretion, after notice to the adverse party, [to] allow, upon any terms as may be just, an amendment to any pleading or proceeding in other particulars; and may upon like terms allow an answer to be made after . . . ."  (*Ibid.*)  "When it appears to the satisfaction of the court that the amendment renders it necessary, the court may postpone the trial . . . ."  (*Id.*, subd. (a)(2).)

Pursuant to section 576, a "judge, at any time before or after *commencement* of trial, in the furtherance of justice, and upon such terms as may be proper, may allow the amendment of any pleading or pretrial conference order."  (Italics added.)  However, " ' " 'even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial.' " ' "  (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1345.)

"It is of course settled that the allowance of amendments to conform to the proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused. [Citations.]  Such amendments have been allowed with great liberality 'and no abuse of discretion is shown *unless by permitting the amendment new and substantially different issues are introduced in the case or the rights of the adverse party prejudiced.*' "  (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31.)  Amendments of pleadings to conform to proof should not be

---

[5]     All further undesignated statutory references are to the Code of Civil Procedure.

18

allowed " 'when they raise new issues not included in the original pleadings and upon which the adverse party had no opportunity to defend.' " (*Ibid*.)  Per section 469, variance "between the allegation in a pleading and the proof shall not be deemed material, unless it has actually misled the adverse party to his or her prejudice in maintaining his or her action or defense upon the merits."  (§ 469.)

"The cases on amending pleadings during trial suggest trial courts should be guided by two general principles: (1) whether facts or legal theories are being changed and (2) whether the opposing party will be prejudiced by the proposed amendment. Frequently, each principle represents a different side of the same coin:  If new facts are being alleged, prejudice may easily result because of the inability of the other party to investigate the validity of the factual allegations while engaged in trial or to call rebuttal witnesses.  If the same set of facts supports merely a different theory [then] no prejudice can result."  (*City of Stanton v. Cox* (1989) 207 Cal.App.3d 1557, 1563.)

   2.   Analysis

The trial court sua sponte amended the cause of action for constructive trust to state a cause of action for breach of fiduciary duty after the close of evidence, when it issued the tentative statement of decision.  Som preliminarily argues the *timing* of the court's sua sponte amendment left her with no meaningful notice of the claim.  Som filed objections to the tentative ruling—including on this very ground—but the trial court overruled the objections on the ground that they were "beyond the scope of objections to a statement of decision."  It adopted its tentative ruling as the final decision without affording Som an opportunity

19

to supplement her papers, brief the issue, or be heard on what she contends is a newly raised matter.

While section 576 allows a judge to amend a pleading "at any time before or after *commencement of trial*, in the furtherance of justice, and upon such terms as may be proper," we have found no statute or case, despite an exhaustive search, that discusses whether a judge may sua sponte amend a complaint in this manner *after conclusion of the trial*.

Thus, we review Sharon's complaint and the allegations therein, as well as the evidence in the record, to determine whether the amendment is supported by the facts alleged and legal theories pled by Sharon. If so, then Som was reasonably put on notice of a claim for breach of fiduciary duty, and the court's post-trial sua sponte amendment to that effect was not an abuse of discretion.

The elements of a cause of action for breach of fiduciary are "the existence of a fiduciary relationship, breach of fiduciary duty, and damages." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

In the caption of her complaint, Sharon entitled her third cause of action as "Constructive Trust." On page 10 of the complaint, Sharon entitled her third cause of action as "Unjust Enrichment And To Impress Constructive Trust Against All Defendants." Under this heading, Sharon alleged Joshua and Som were "unjustly enriched and have benefited at the direct expense" of Sharon because the two properties were solely owned by Sharon and were never purchased by Joshua or Som. Sharon argued that as a result of Som's "fraudulent and malicious slander of [Sharon's] title" to the properties, Som became an involuntary trustee holding the Gundry and Anaheim properties,

20

their rents, issues, royalties, and profits in constructive trust for Sharon, "with the duty to convey" them back to Sharon.

Throughout her complaint, Sharon alleges she "instructed *Joshua* to safely hold" the Gundry and Anaheim property deeds. She alleges she entered into a "Refinancing Agreement" with *Joshua and Sarah* in connection with the Anaheim property. She describes multiple communications and transactions that she had with *Joshua and Sarah.* She also alleged having "instructed *Sarah* to give Joshua" the Anaheim deed and that "*Joshua* agreed to safely hold" the deed. There is not one allegation included in Sharon's complaint that indicates Sharon and Som had <u>any</u> communication about either property, the numerous grant deeds executed/notarized by Sharon, Joshua, and Sarah, or the Refinancing Agreement Sharon entered into with Joshua and Sarah, but not Som. We see no allegations that support a fiduciary relationship between Sharon and Som. We see no conduct by Som toward Sharon that elevated their relationship from one of mother-in-law and daughter-in-law to one of beneficiary and fiduciary.

Similarly, throughout trial proceedings, the testimony provided by Sharon—whom the trial court found credible—does not suggest the existence of a fiduciary duty owed by Som. Sharon testified that *Joshua* approached her on multiple occasions for investment opportunities, that she "trusted *Josh* to make appropriate investments," that she signed a power of attorney as to *Joshua* (whom she knows sometimes signed documents on her behalf). Sharon transferred $250,000 in funds from her home equity line of credit, as instructed by *Joshua*, and he was to invest the money "for [her] future, for [her] retirement." Sharon testified that she *never* had any discussions with Som about the Anaheim property. Sharon had spoken with *Joshua*

21

only about creating the trust. He told her "it was advantageous to buy" property with a trust and appointed himself the trustee of Trust 1. She testified she never asked for a monthly accounting of the rents because she "trusted *[her] son* to take care of [her] interests."

The trial court found Joshua was Sharon's trustee and received her $250,000 "to be invested by him on Sharon's behalf." We agree: one who receives the money of another to invest on that person's behalf becomes a fiduciary. A trustee has a duty to administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law. (*O'Neal v. Stanislaus County Employees' Retirement Assn.* (2017) 8 Cal.App.5th 1184, 1209.) A trustee also owes a duty of loyalty in that he has a duty to administer the trust solely in the interest of the beneficiaries; this duty is frequently invoked as protection against creating conflicts between a trustee's fiduciary duties and personal interests. (*Ibid*.) The evidence and testimony at trial supports the finding that Joshua owed and breached a fiduciary duty to Sharon.

However, the same cannot be said for Som. Sharon's complaint does not allege facts giving rise to the existence of any fiduciary relationship between Som and Sharon. And the evidence and testimony proffered by Sharon (who was found credible by the court) does not support the existence of any fiduciary duties owed to Sharon by Som.

The trial court below found Som "owed fiduciary duties to Sharon" because the "parties were family members and Sharon reposed trust and confidence in her daughter-in-law." The trial court did not cite, and we have not found, any authority to support the notion that one owes fiduciary duties simply by being a trusted in-law or soon-to-be ex-in-law. " '[B]efore a person can

be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.' " (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 386.) Sharon's allegations in the complaint and the testimony that was credited by the court below do not establish that Som and Sharon had a relationship[6] that imposed a fiduciary obligation on Som to act on behalf of and for the benefit of Sharon. Nothing in the record suggests they ever communicated about Sharon investing money in the two properties. Sharon's testimony made clear that all her communications were with Joshua (and sometimes, Sarah), but never did she indicate she communicated with Som about the properties, the Refinancing Agreement, Trust 1, or anything else for that matter. Thus, Sharon did not meet the first element of breach of fiduciary duty, the existence of a fiduciary relationship.

The only allegations about Som in the complaint are that Som caused the Anaheim deed and Gundry deed to be recorded at the L.A. County Recorder's Office "without [Sharon's] knowledge or permission." Based on this, the trial court found Som's "recordation of these two deeds was to place apparent record title in the name of Joshua, in an over-reaching attempt to make a community property claim in the marital dissolution action." This finding does not support a finding that a fiduciary relationship existed between Som and Sharon.

---

[6] "[E]xamples of relationships that impose a fiduciary obligation to act on behalf of and for the benefit of another are 'a joint venture, a partnership, or an agency.' " (*Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1339.)

23

Based on the foregoing, a reasonable person would not interpret Sharon's complaint as alleging breach of fiduciary duty by Som. Consequently, we find the trial court's sua sponte post-trial amendment of the third cause of action to one for breach of fiduciary duty prejudiced Som; it contravened basic tenets of law and motion practice (§ 1010; Cal. Rules of Court, rule 3.1110(a)) as well as Som's right to notice, which is an element of due process. (*Derry v. Superior Court* (1968) 266 Cal.App.2d 556, 559–561.) "It is a fundamental concept of due process that a judgment against a defendant cannot be entered unless [she] was given proper notice and an opportunity to defend." (*In re Marriage of Lippel* (1990) 51 Cal.3d 1160, 1166.) " 'Due process requires that all parties be notified of the facts and issues in dispute, that each party be afforded a fair opportunity to present evidence in open court, and that judgment be rendered based on an evaluation of the evidence on each side, findings of fact and conclusions of law.' " (*Carr v. Kamins* (2007) 151 Cal.App.4th 929, 936.) A court that rules on a material issue "without even mentioning to the parties at the time that it was considering the question" violates due process. (*Bricker v. Superior Court* (2005) 133 Cal.App.4th 634, 639.)

Because Som had no notice that the court was considering a breach of fiduciary duty claim against her, the court violated due process by considering it for the first time in its proposed statement of decision, without notice to and opportunity for Som to be heard on the issue, or present testimony or evidence as to the elements of breach and any affirmative defenses thereto. For instance, Som argues on appeal that had she known Sharon was alleging a claim for breach of fiduciary duty, she would have asserted a statute of limitations defense and presented evidence supporting the same. "The power vested in a judge is to hear and

24

determine, not to determine without hearing." (*Estate of Buchman* (1954) 123 Cal.App.2d 546, 560.)

We are persuaded that the trial court's sua sponte post-trial amendment was not supported by the allegations in Sharon's complaint or the evidence and testimony found credible by the trial court. Amending the complaint to include a breach of fiduciary claim after conclusion of trial unfairly prejudiced Som and therefore constituted an abuse of discretion. For this reason, we reverse the trial court's judgment on Sharon's third cause of action.

B. *The Trial Court Erroneously Determined that Conditional Delivery of the Deeds was Valid. The Judgment on the Causes of Action for Slander of Title, Quiet Title, Declaratory Relief, and Cancellation of Deeds is Reversed.*

We conclude the trial court misinterpreted the law of conditional delivery of deeds.

1. Applicable Law

A deed is effective only when delivered. (Civ. Code, § 1054.) Delivery requires a present intention to pass title, and that is a question of fact upon which the grantor may testify. (*Ivancovich v. Sullivan* (1957) 149 Cal.App.2d 160, 164 (*Ivancovich*).) However, under Civil Code section 1056, a "grant [deed] cannot be delivered to the grantee conditionally. Delivery to him, or to his agent as such, is necessarily absolute, and the instrument takes effect thereupon, discharged of any condition on which the delivery was made." This proposition of law is clearly stated in *Blackledge v. McIntosh* (1927) 85 Cal.App. 475, 482, and remains unchanged today.

25

A deed cannot be delivered to the grantee as an escrow; if it is delivered to him, it becomes an operative deed, freed from any condition not expressed in the deed; it vests title in him, although this may be contrary to the intention of the parties. (*Ivancovich*, *supra*, 149 Cal.App.2d at p.165–166.)

The rule is succinctly summed up by California commentators. "If the grantor makes a deed, intending to divest himself or herself completely but delivers it to the grantee with the understanding that it is not to take effect until the grantee performs some condition, the complete divestment is inconsistent with the annexed condition, and the grantee takes absolutely, free from the condition." (12 Witkin, Summary of Cal. Law (11th ed. 2021) Real Property, § 310, p. 364.) "A deed cannot be delivered to the grantee under any condition not expressed in the deed; any delivery *to the grantee*, or to the grantee's agent, is absolute and the deed therefore takes effect upon delivery, and any purported condition is ignored. If the grantor executes and delivers a deed to the grantee with the intent of divesting title, but imposes an oral condition on the transfer, the condition is disregarded and the grantee receives title free and clear of the condition. If the condition does not occur, the grantor may be able to recover damages from the grantee, but the title cannot be recovered." (3 Miller & Starr, Cal. Real Estate (4th ed. 2021) § 8.46, p. 8-137, fns. omitted.)

Finally, cancellation of deeds is normally governed by Civil Code section 3412, which provides: "A written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged, and ordered to be delivered up or canceled."

We address the two properties separately.

## 2. The Gundry Property

Sharon testified Joshua wanted to buy the Gundry property from her, and she executed the grant deed "with the intention that if he got the financing to purchase the property, [she] would sell the property to him." She confirmed having signed the July 29, 2010 grant deed which provided: " 'For a full valuable consideration, receipt of which is hereby acknowledged, Sharon J. McMillin, an unmarried woman, hereby grants to Josh McMillin, a married man, the [Gundry] property.' "

Joshua testified it was orally agreed that the deed was not to be recorded until he either purchased the property from Sharon or Sharon died. He testified that these conditions were not made in writing and were not attached to or part of the deed. We can confirm by reviewing the July 29, 2010 grant deed that these were oral conditions as they were not written on the grant deed itself.

Both Sharon and Joshua testified Joshua relied upon the executed, notarized grant deed when he unsuccessfully applied for financing.

The trial court found that the Gundry property "was purchased on or about July 22, 2010" by Sharon "with a loan in her name (as reflected in the security instrument – [the Deed of Trust])" and she took title in her name. The statement of decision also provided: "Sharon testified that her son expressed an intention to purchase the Gundry property from her. . . . Sharon signed and provided [the unrecorded deed] to Joshua to allow him to attempt to obtain financing to be able to purchase the Gundry property from her. . . . She credibly testified that she gave him the deed with th[e] understanding that 'if he got the financing to purchase the property, that [she] would sell the

27

property to him' and that by giving him the deed, she did not intend to deliver it within the legal meaning—i.e. immediate transfer of title." (Italics omitted.) The trial court concluded Sharon never intended "legal" delivery of the Gundry deed.

We do not question the trial court's findings, but do not accept them as a valid basis for the court's legal conclusions. The oral condition expressed between Sharon and Joshua that the grant deed would not be effective unless Joshua successfully obtained financing is nullified by Civil Code section 1056. No condition was expressed in the instrument itself and therefore, under Civil Code section 1056, the oral condition was ineffective. "Under such circumstances the delivery of the deed and vesting of such title occurs by operation of law even though the result may be contrary to the express stipulation of the parties." (*Ivancovich*, *supra*, 149 Cal.App.2d at p. 165.)

As explained by the court in *Ivancovich*, "[t]he foregoing principle of law may appear to be harsh and in some cases it certainly is contrary to the wishes and intent of the parties. The reason for the rule appears to be the reluctance of the law to permit or encourage *the conditional manual delivery of a deed to a grantee which upon its face appears valid in all respects and thus open the way for fraud and misrepresentation* as well as honest misunderstanding in regard to third parties who have no knowledge of the conditions imposed *aliunde*." (*Ivancovich*, *supra*, 149 Cal.App.2d at p. 166, first italics added.)

It is precisely for this stated reason that the trial court's ruling must be reversed. The trial court's ruling validated Sharon and Joshua's misrepresentation to the world, including financial lenders, that Joshua was the owner of the Anaheim property, based on a grant deed that "appears valid in all respects" when, in reality, they had a private, verbal

28

understanding that the grant deed was only conditionally effective.  Sharon cannot have it both ways.  The Gundry deed, being absolute upon its face, and having been physically delivered to Joshua by Sharon herself, took effect at once without the oral conditions.

We conclude the deed was delivered and is valid without the oral conditions.  Sharon is not entitled to judgment quieting title in her name.  The judgment quieting title on the Gundry property is reversed with directions to enter a new judgment quieting title in Joshua's name.

3.     The Anaheim Property

The trial court found in its statement of decision that the Anaheim property was purchased on or about September 10, 2010.  "Sharon was told by her son that Anaheim was purchased using Sharon's funds as down payment, and title to Anaheim was placed in a Trust for Sharon (when it was purchased from Frank Prior), for which Sharon was the only beneficiary (2153 E. Anaheim S. J. McMillin Trust)."  "Joshua informed Sharon that they needed to refinance the loan from the previous seller Frank Prior.  Sharon attempted to qualify for a loan but was denied due to a 'ding' on her credit.  Ultimately, Sharon testified that her daughter Sarah was approached by Joshua, and [Sarah] was able to obtain the loan."  "Sharon never agreed or intended to transfer title of the properties unless and until Joshua obtained the financing to buy her out."  "When Joshua was unable to obtain loans to purchase the properties, the deeds she executed was void."

Again we find the conditional delivery ineffective.  Regardless of the source of funds used to purchase the Anaheim property, the following facts remain.  A grant deed was executed

29

on September 8, 2010, transferring title to Trust 1. Sharon alleged in her complaint that because she was unable to qualify for a refinance, she "agreed" with Joshua and Sarah "that the [Anaheim] property would be transferred to Sarah, that Sarah would refinance the property, and that the property would subsequently be transferred back" to Sharon. The allegations in Sharon's own complaint support that she intended the deeds to take effect as she literally states she agreed that title "would be transferred to Sarah, that Sarah would refinance the property, and that the property would subsequently be transferred back."

On September 20, 2010, Sharon executed/notarized a grant deed transferring title to Sarah. Joshua testified the grant deed was "intended to take effect right away so [that his] sister could get a loan." "[T]hat was one of the requirements the lender needed for her to get a loan." All parties testified Sarah qualified for and obtained the loan. On July 18, 2011, Sarah executed a grant deed transferring the Anaheim property to Joshua. Sharon said she "instructed Joshua to safely hold" the July 18, 2011 grant deed transferring the Anaheim Property from Sarah to Joshua and "to not record it until . . . either [Sharon] died or Joshua purchased" the Anaheim property from Sharon.

Once more, there cannot be a conditional delivery of a deed to a grantee as alleged and argued by Sharon, and as found by the trial court. There are no written conditions included as part of the July 18, 2011 grant deed from Sarah to Joshua. Any oral condition expressed by Sharon to Joshua in connection with Sarah's fully executed and notarized July 18, 2011 grant deed to Joshua is discharged under Civil Code section 1056. Plus, as it relates to the legal delivery of the Anaheim deed from Sarah to Joshua, we find Sharon's intent regarding delivery does not matter, as she was not the grantor of that deed—Sarah was. For

30

these reasons, we reverse the trial court's ruling that because "Joshua was unable to obtain loans to purchase the properties, the deeds she executed was void." No condition was expressed in the instrument itself and therefore, under Civil Code section 1056, that oral condition was ineffective. The trial court's reasoning is unsupported by the evidence and contrary to law. The July 18, 2011 Anaheim deed signed and notarized by Sarah and delivered to Joshua is a deed absolute on its face. The judgment is reversed with directions to enter a new judgment quieting title to the Anaheim property in favor of Joshua.

As we are quieting title to both properties to Joshua, we also reverse the judgment as to the second, fourth, sixth, and seventh causes of action for slander of title, declaratory relief, and cancellation of the deeds. All are based on the same erroneous legal conclusion that Sharon's transfer of title to the properties was ineffective and she was the rightful owner of the properties. And there were no facts presented to support a finding that the deeds were void or voidable in Sharon's favor. (Civ. Code, § 3412.) The trial court's ruling cancelling the two deeds and declaring title to both properties in Sharon's name is reversed, as title was validly transferred to Joshua via the Gundry and Anaheim Deeds.[7]

C.  *The Trial Court's Findings and Orders Interfered with Issues under the Jurisdiction of the Family Law Court.*

Som argues the findings made by the trial court in the civil case are "contrary to the evidence in the record in which it was

---

[7]    The trial court made no ruling on the cause of action for theft. That omission has neither been appealed nor briefed; we find the issue waived.

31

conceded at a minimum that [Som] and Joshua made mortgage payments and paid off Sharon's HELOC." She believes the findings and orders made by the civil case court—i.e., that no person other than Sharon has any interest or claim to either Anaheim or Gundry properties—"interfered with the family law court's jurisdiction to characterize community property interests."

We agree.

Where a proceeding has been assigned for hearing and determination to one department of the superior court by the presiding judge and the proceeding has not been finally disposed of, it is beyond the jurisdictional authority of another department of the same court to interfere with the exercise of the power of the department to which the proceeding has been so assigned. If such were not the law, conflicting adjudications of the same subject matter by different departments of the one court would bring about an anomalous situation and doubtless lead to much confusion. (*Ford v. Superior Court* (1986) 188 Cal.App.3d 737, 741–742.) After a family law court acquires jurisdiction to divide community property in a dissolution action, no other department of the superior court may make an order adversely affecting that division. (*Askew v. Askew* (1994) 22 Cal.App.4th 942, 961–962.)

Here, *Glade v. Glade* (1995) 38 Cal.App.4th 1441 (*Glade*) is instructive. In *Glade*, husband and wife were involved in a dissolution action. (*Id*. at p. 1445.) Husband's parents, as trustees of a trust, brought a civil action to foreclose on the couple's community property under the terms of a note and trust deed used to secure a loan from the trust to the divorcing couple. (*Ibid*.) The trial court in the civil action granted judgment for the trust and the subject property was foreclosed on by the trust. (*Id*. at p. 1448.) The trial court's order in the civil case removed from the family law court the power to characterize and divide the

32

property as community. (*Id*. at p. 1455.) The civil judgment was reversed, because once the marital dissolution action was underway, the family law court acquired jurisdiction over alleged community property in the hands of third parties and the civil trial court had no jurisdiction to so act. (*Id*. at pp. 1455, 1458.)

Here, the evidence in the record establishes that Joshua and Som lived at the Anaheim property and paid the mortgage for a period of time. This fact is not disputed or contested by any party.[8] This creates reimbursement rights under the Family Code, claims for *Epstein* credit and/or *Watts* charges—all issues falling within the purview of and typically decided in dissolution cases by the family law court. (*Glade*, *supra*, 38 Cal.App.4th at pp. 1452–1453 [characterization and division of property as community is entrusted to the family law court].)

The family law court specifically included in the judgment of dissolution filed September 11, 2018 that all "issues regarding the properties and related transactions not resolved in the civil case are reserved for adjudication in the family law case. These include *Epstein* credits; *Watts* charges; Family Code § 2640 reimbursement; reimbursement for rent proceeds collected by [Joshua] after separation; reimbursement for all monies paid by [Som] and [Joshua] to claimant [Sharon] during marriage, including but not limited to payments to her home equity line of credit [etc.]" The judgment also specified that Som "brought

---

[8]     Sharon testified that "Josh or Som" made the payments on the loan on the Anaheim property until 2017. Sharon testified Joshua "and Som would pay the monthly mortgages" and Sarah was not "responsible for paying them." Sarah also testified there was a time "when Som was still paying, and Josh said he could not so [Sarah] was covering his portion."

significant money and property into the marriage and it produced income."

The issue then becomes this:  by finding that Som has *no interest, right, or claim* with respect to the two properties, the trial court in the civil case essentially usurped from Som the ability to raise issues that are properly within the province of the family law court.  The parties had not pled and litigated community property claims in the civil case; thus the language used by the trial court—that Som has no interest or right or claim to either Gundry or Anaheim property—was too broad and went beyond the scope of what was properly before the trial court in the civil case.

We thus reverse the judgment in this respect as well and remand to the trial court to amend the language therein to provide that its orders do not preclude Som from raising claims in the family law court under its specific jurisdiction.[9]

D.      *The Trial Court Did Not Err When It Admitted Impeachment Evidence about Som's Financial Circumstances in 2009.*

Evidence was presented that Som filed a request for a fee waiver in 2009.  Evidence was also presented that Som had several tax liens against her personally for the years 2007 to 2011.  In its statement of decision, the trial court found Som claimed "she was indigent and had no funds to pay for the court

---

[9]      During oral argument, Som requested that we remand the case to the family law department for further proceedings consistent with this opinion.  We decline to do so, as the family law case is not before us.  We take no position on how the family law court should proceed if appropriate request(s) for orders are filed.

34

fees . . . under penalty of perjury" via her Request to Waive Court Fees. Som had "several tax liens against her from 2007 thru 2011. . . . She testified that she did not take care of tax liens until 2014 or 2015. [¶] Based on [Som's] testimony and the exhibits admitted, the court finds that she had insufficient funds to purchase the Anaheim and Gundry Properties in 2010 as she claimed."

On appeal, Som argues "matters having nothing whatsoever to do with the merits of any claim in this case should have been excluded from the court's consideration as improper collateral impeachment."

We disagree with Som. Her financial condition and ability to afford the down payments to purchase the Gundry and Anaheim properties were facts in issue in the underlying case. Proof of Som's filing of a request for fee waiver in 2009 as well as the existence of tax liens against her from 2007 through 2011 are undoubtedly relevant in the trial court's determination of whether Som had the funds to purchase the Gundry and Anaheim properties in 2010. We see no error in this regard.

E.  *The Trial Court Did Not Deprive Som of a Fair Trial by "Cutting off [Her] Trial Time Unexpectedly."*

Som argues that while "it is within the province of the [c]ourt to limit trial time," the trial court cut off her time "in the middle of trial." She contends this prejudiced her in that it cut off her time to present her exhibits and testimony in her case-in-chief and her amended cross-complaint, depriving her of a fair trial and unfairly prejudicing her.

We disagree. We have reviewed the reporter's transcript, and do not find the trial court "cut off" her time "unexpectedly."

Trial took place February 20, 22, and 26, 2019.  On February 22, 2019, Sharon completed calling all her witnesses and rested her case.  Som began her defense.  Later that afternoon, the trial court stated:  "All right.  We'll stop here.  Four o'clock.  We'll come back on Tuesday. . . .  I do have a pretty heavy calendar.  I hope we will start at 10:30.  You said you have about two hours of examination . . . .  How much more do you have?"  Counsel for Som responded:  "I will go over the two hour estimate I gave you earlier.  I probably have another hour left."  Counsel for Sharon stated he required a "half hour" for cross.  Joshua, self-represented, stated he needed "an additional half hour to an hour for questions."

The trial court told the parties it had "another trial starting on Wednesday, so [it] need[s] to make sure we close on Tuesday."  The trial court also stated "[b]oth parties indicated that this will be lasting two days, maybe a day.  Now we're going over, estimate, almost double."

On February 26, 2019, as Som continued with her defense case, the trial court stated:  "All I can tell you is, based on both counsel's representation, I reserve time.  And basically, your time estimate is off significantly.  And that's [been] affecting my other cases that I have set for trial tomorrow. . . . So I'm going to give you a little bit of time, about another—we can't go past an hour and a half . . . estimate on—on your time . . . ."

Thereafter, there were 50 more pages of testimony provided via the reporter's transcript, until the trial court asked both sides, "Anything else?"  To which counsel for both parties responded:  "No, your honor."  Then, counsel for Som stated:  "We rest, your honor."

We review the trial court's imposition of time limits for abuse of discretion. (*People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, 148.)

Based on our review of the record, contrary to Som's assertions, we do not find the trial court cut off her time "in the middle of trial" and affected her "time to present her exhibits and testimony on her case-in-chief." Courts have the authority to request time estimates and enforce time limits, as long as the limits are reasonable. Here, the trial court repeated its concerns to both counsel on the second and third days of trial, February 22 and 26, 2019, that their time estimates were way off, to the point where it is affecting trial on other cases on the court's calendar. It is within province of the trial court to impose reasonable time limits during trial. (*People v. Marshall* (1996) 13 Cal.4th 799, 854–855.) The trial court proceeded more than fairly, as it provided Som an hour and half more time than what she had estimated to the court. What's more, the record specifically provides that counsel for Som continued to elicit testimony and present evidence until telling the court: "We rest, your honor."

There was no abuse of discretion.

## DISPOSITION

The June 24, 2019 judgment is reversed, as follows:

The judgment against Som on the amended third cause of action (for breach of fiduciary duty) is reversed.

The judgment quieting title to the Gundry and Anaheim properties in favor of Sharon is reversed with directions to enter a new judgment quieting title to the properties in favor of Joshua, per the July 22, 2010 Gundry deed and the July 18, 2011 Anaheim deed. The judgment is also reversed as to the causes of

action for slander of title, declaratory relief, and cancellation of deeds.

We vacate the trial court's finding that Som has no interest, right, or claim with respect to the two properties. We remand with instructions to the trial court to amend the language of the judgment to provide that its orders do not preclude Som from raising proper claims for community property interests, *Epstein* credits, *Watts* charges, or other similar claims in the family law court.

Costs on appeal awarded to appellant Som Rathmeny Eare.

STRATTON, J.

We concur:

GRIMES, Acting P. J.

OHTA, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| SHARON MCMILLIN,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SOM RATHMENY EARE,<br><br>    Defendant and Appellant;<br><br>JOSHUA NATHAN MCMILLIN,<br><br>    Defendant and Respondent. | B298990<br><br>(Los Angeles County<br>Super. Ct. No. NC060255)<br><br>ORDER CERTIFYING OPINION<br>FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on September 30, 2021, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

_____
GRIMES, Acting P. J.            STRATTON, J.            OHTA, J.*

_____

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.